# UNITED STATES DISTRICT COURT
## MIDDLE DIVISION OF FLORIDA
### JACKSONVILLE DIVISION

**T-MOBILE SOUTH LLC,**

**Plaintiff,**

**v.**                                                    **Case No.: 3:06-cv-846-J-16TEM**

**CITY OF JACKSONVILLE, FLORIDA,**

**Defendant.**

_____/

## <u>ORDER</u>

Plaintiff, T-Mobile South LLC ("T-Mobile"), a cellular telephone company challenged the City of Jacksonville's (the "City") denial of two applications to construct a camouflaged cell phone tower at 5266 Losco Road in Jacksonville, Florida (the "Proposed Site") as violative of the Federal Telecommunications Act of 1996 (the "Act"). 47 U.S.C. § 332. The parties' cross-motions for summary judgment (Dkts. 27 and 28) on consolidated Count I and responses in opposition (Dkts. 29 and 30) are pending before the Court.

The facts of this case are not in significant dispute. The parties disagree about the application of the facts to the legal standards articulated below. After careful consideration of the parties' memoranda of law and supporting documents, the Court finds that the City's Motion for Summary Judgment on consolidated Count I (Dkt. 28) will be **GRANTED** and T-Mobile's Motion for Summary Judgment on Consolidated Count I (Dkt. 27) will be **DENIED**.

# I.      Procedural and Factual History

This consolidated case resulted from the City's denial of T-Mobile's two applications to construct a cell phone tower on the Proposed Site.[1] In the first application, T-Mobile sought approval for a 150-foot tower (the "First Application"). Following denial of the First Application, T-Mobile filed a second application to build a 130-foot tower at the same location (the "Second Application"), which the City also denied.

Following denial of the First Application, T-Mobile filed a two-count complaint in Case Number 3:06-cv-770-J-16HTS.  Count I sought declaratory and injunctive relief and Count II sought only injunctive relief for violations of the Act.  Count II was pled in the alternative to Count I and contained the traditional elements of injunctive relief.

Following denial of the Second Application, T-Mobile filed a four-count complaint in Case Number 3:06-cv-846-J-16TEM.  Counts I and II were based on the City's denial of the 130-foot tower and requested the same relief as Counts I and II in the First Application case.  Counts III and IV alleged that the City's denial of T-Mobile's applications to construct both the 150-foot and 130-foot towers had the effect of prohibiting the provision of personal wireless service in violation of the Act's Section 332(c)(7)(B)(iii).  When consolidating the First and Second Application cases, the Court dismissed Count II and  abated Counts III and IV pending resolution of the parties' cross-motions for summary judgment on Count I of the consolidated case.

---

[1] On April 24, 2007, this case was consolidated with Case Number 3:06-cv-770-J-16HTS. (Dkt. 26).

### The Proposed Cell Tower

T-Mobile proposed to build an unmanned and "camouflaged" cell tower which would require only one maintenance visit per month.  The proposed cell tower is "camouflaged" in that it is designed to look like a flag pole, which assists in "hiding, obscuring, and concealing both the tower itself and its antennas (which are housed inside the flag pole)." (Dkt. 27 at p. 4).  T-Mobile does not plan to fly a flag from the cell tower.  Between the First and Second Applications, T-Mobile reduced the height of the proposed cell tower from 150-feet to 130-feet.

### The Proposed Site

The Proposed Site, 5366 Losco Road in Jacksonville, Florida  is located near the southern intersection of I-295 and I-95.  It  contains a single-family residence and is zoned rural residential ("RR") with an underlying Low Density Residential ("LDR") land use designation.  The Proposed Site is surrounded by properties that are zoned for low density single-family residential uses. Contiguous properties contain single-family homes. Several new residential subdivisions are being built near the Proposed Site.

### II.      Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

In determining whether to grant summary judgment, the Court must view the evidence and inferences drawn from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  Augusta Iron & Steel Works, Inc. v. Employers Ins. of

Wausau, 835 F.2d 855, 856 (11th Cir.1988); WSB-TV v. Lee, 842 F.2d 1266, 1270 (11th Cir. 1988).

In Lee the Eleventh Circuit explained that:

> In deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." [citation omitted].  The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts.  When more than one inference can be reasonably drawn, it is for the trier of fact to determine the proper one.

Id.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion.  See Augusta Iron & Steel Works, Inc., 835 F.2d at 856.

The principles governing summary judgment do not change when the parties file cross-motions for summary judgment.  When faced with cross-motions, the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts.

**III.    Discussion**

T-Mobile alleges that it is entitled to summary judgment on Count I for three reasons.  First, T-Mobile claims that the City's denials of the First and Second Applications failed to contain statutorily required explanations of the reasons for the denials.  Second, T-Mobile claims that the City's denials were based on statutorily impermissible generalized aesthetic concerns, which were not supported by substantial evidence. Third and finally, T-Mobile claims that to the extent that the City's denials were based in whole or in part, on the feasability of an alternative site for the camouflaged cell phone tower, the denials violate the Act because no evidence was presented that

the "alternative site" is either appropriate for a camouflaged cell phone tower or available to T-Mobile for that purpose. The City claims that it is entitled to summary judgment because its denials meet the Act's statutory requirements and are supported by substantial evidence.

### A. The Act and the Tower Ordinance

The Act provides in pertinent part:

> **(7) Preservation of local zoning authority**
> **(A) General Authority**
> Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a state or local government . . . over decisions regarding the placement, construction, and modification of personal wireless service facilities.
> **(B) Limitations**
> (i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government ...
> (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
> (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.
>  . . . .
> (iii) Any decision by a State or local government . . . to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

47 U.S.C § 332(c)(7)(B).

Courts have observed that § 332(c)(7)(B) is "a deliberate compromise between two competing aims - to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers." U.S. Cellular v. City of Franklin, New Hampshire, 413 F.Supp.2d 21, 29 (D. New Hampshire 2006) (citing to Town of Amherst v. Omnipoint Commc'ns Enters. Inc., 173 F.3d 9, 13 (Ist Cir. 1999)). "Basically, [the Act] gives local authorities the first say in determining where and how to construct [wireless communications facilities]; if, however, a local authority's actions violate the provisions of [the Act], a court has the authority to

order the locality to take such steps as are necessary to grant the relief which the wireless provider had originally requested from the locality." Id. (internal citations omitted).

Pursuant to the City's Ordinance Code (the "Code") § 656.1505 (the "Tower Ordinance"), a telecommunication company wishing to construct a telecommunications tower within the City must first file an application with the City's Planning Commission (the "Commission").[2]   The application process has three steps.   First, a Planning Coordinator reviews the application to determine if it is complete.   Second, the completed application is forwarded to the Planning and Development Department (the "Planning Department"), which prepares a report recommending denial or approval.   Third and finally, the Commission holds a public hearing and makes a final determination on the application.

When rendering a final decision on a proposed cell tower, the Commission must adhere to the Tower Ordinance, which provides that the Commission "shall approve, deny or conditionally approve" requests to construct camouflaged towers if they "(1) compl[y] with the tower siting and design standards and performance standards . . . .; and (2) are compatible with the existing contiguous uses or zoning and compatible with the general character and aesthetics of the surrounding neighborhood or area, considering (a) the design and height of the communication tower; and (b) the potential adverse impact upon any environmentally sensitive lands, historic districts or historic landmarks, public parks or transportation view corridors." (Amended Compl. ¶ 15, citing to Section 656.1505).   It is undisputed that the First and Second Applications were denied after completion of the Tower Ordinance's three-step process.

---

[2]      In this case although the City is the named Defendant, the Commission "is the City entity responsible for voting on camouflaged communication requests" (Dkt. 28 at p. 2) such as the First and Second Applications.   Thus, City and Commission will be referred to interchangeably.

**The First Application**

The Planning Coordinator determined that the First Application was complete and forwarded it to the Planning Department.  The Planning Department issued a report that found T-Mobile's proposed cell tower complied with the siting and design and performance standards of the Code. As the Planning Department noted in its report, it considers the height, location, existing uses and topography when it reviews a communication tower application. (Amended Compl., Ex. C). However, the report recommended denial of the First Application because "[t]he proposed design and height of the tower are not compatible with existing use and zoning" because "RR zoning districts have maximum height limitations of 35 feet" and [t]he proposed tower is 150-feet in height . . . ." (Williamson Aff., Ex. 4 at p. 2). The report further noted that "[t]he tower is located within close proximity to the DOT right -of-way for I-295" and that "[w]hen considering the residential zoning of the property, contiguous uses, and its proximity to a major right -of-way . . . the applicant should pursue placing a camouflaged light-pole designed tower within the DOT right-of-way . . ."[3] (Williamson Aff., Ex. 4 at p. 3).

As required, a public hearing was held on the First Application.  At the hearing, the Planning Department reiterated the concerns raised in its report with the proximity of the proposed tower to the adjacent residential properties. (Amended Compl. Ex. D, pp. 3-4). According to the City, the photographic simulations presented by T-Mobile of the proposed tower demonstrated that a limited number of trees would screen the tower from the adjacent residential uses. (Dkt. 28 at p. 4).

---

[3]  DOT is shorthand for the "Department of Transportation."

In response, T-Mobile presented evidence that camouflaged towers were permitted in all of the City's Zoning Districts; that there are no *per se*[4] height limitations applicable to camouflaged towers; that the proposed cell tower "blended" into the surrounding topography, which includes large residential lots, I-295 and I-95; and that the proposed tower would be buffered by a large clump of trees." (Williamson Aff., Ex. 5, pp. 5-11)).   In addition, T-Mobile noted that the Commission had recently approved six similar towers in similar zoning districts.   T-Mobile highlighted the Commission's recent approval of a similar tower application on a parcel of land owned by a church.   (Williamson Aff., Ex. 5, pp. 6-8) (specifically calling the Commission's attention to its recent approval of a 140-foot camouflaged tower on church property containing few trees, zoned RR and surrounded by LDR zoning, including an established neighborhood).

Finally, T-Mobile presented evidence that the DOT right-of-way would be an inadequate alternative site because construction of the cell tower on the DOT site would have an adverse impact on a transportation view corridor; the DOT site was actually closer to well-established and more densely populated suburban neighborhoods; a cell tower on the DOT site would be more conspicuous than one on the Proposed Site because the Proposed Site contains more tree cover; and if the cell tower were constructed on the DOT site the antennas would have to be on the outside of the flag pole instead of inside, which would reduce the camouflaging effect of the cell tower. (Williamson Aff., Ex. 5, pp.8-10).

---

[4]  Pursuant to the siting and design standards and performance standards set forth in Section 656.1505 of the Code, there is no height limit for camouflaged towers, "so long as the proposed tower is architecturally and aesthetically compatible with the surrounding community." (Amended Compl., Ex. B at p. 7).

During the hearing, one witness testified that she was opposed to the Proposed Site hosting

a cell tower. The Commission concluded the public hearing by voting to deny the First Application

and followed this oral denial with a written order.  In the order, the Commission wrote:

> The proposed tower does not comply with the tower siting and design
> standards and performance standards of part 15, subpart A, Ordinance Code.

> The proposed tower design is not compatible with the existing contiguous uses
> or zoning and is not compatible with the general character and aesthetics of the
> surrounding neighborhood or area.

(Williamson Aff., Ex. 7, ¶¶ 2-3).

**The Second Application**

Following the Commission's denial of the First Application, T-Mobile filed the Second

Application for a 130-foot tower, which tower was "essentially identical to the 150-foot tower

except for height."  (Dkt. 27 at p. 7, citing to Williamson Aff., Ex. 9).  In its written report, the

Planning Department found that the Second Application failed to comply with the tower siting and

design standards and performance standards of the Tower Ordinance.  The Planning Department

based its finding on the fact that the 130-foot tower would not be architecturally compatible with

the surrounding community. The Planning Department elaborated on this point in its report to the

Commission noting "[t]he proposed design and height of the tower are not compatible with existing

uses and zoning" because "[c]ontiguous uses are single-family homes" and "[c]ontiguous RR zoning

districts have maximum height limitations of 35 feet . . . " (Williamson Aff, Ex. 10).  The Planning

Department report further provided that "[t]he tower is located within close proximity to the DOT

right-of-way for I-295" and that "[w]hen considering the residential zoning of the property,

contiguous uses, and its proximity to a major right-of-way . . . the applicant should pursue placing

a camouflaged light-pole designed tower within the DOT right-of-way. . . " (Williamson Aff., Ex. 10, pp. 3-4).

During the public hearing Ms. Kelly, a Planning Department staff member testified that the 130-foot tower would be incompatible to the surrounding area because of its "proximity to the residential and the future residential development surrounding that vicinity, and also to the transportation view corridor as well along 295." (Amended Compl., Ex. E, pp. 61-62).

During the public hearing on the Second Application T-Mobile presented evidence that:

> - the proposed tower would be placed in a heavily treed area on 3.6 acre parcel of property zoned [RR] which would buffer it significantly from neighboring residential uses.  (Williamson Aff., Ex. 11, pp. 8,14, 24 and 54).

> - the proposed tower would be surrounded by 33 acres of property zoned [RR] containing only six single family homes.  (Williamson Aff., Ex. 11 at p. 11).

> - several of the adjacent property owners do not object to the construction of the proposed tower.  (Williamson Aff., Ex. 11, pp. 12-13 & 53).

During the public hearing T-Mobile also presented evidence that the DOT site was inadequate because:

> -DOT had never given T-Mobile approval to construct a wireless communications tower on its property (in fact, for over a two year period it has never responded to T-Mobile's request to investigate the site). (Williamson Aff., Ex. 11 at p. 40).

> -there was no way to access the site inasmuch as it is surrounded by Interstate 295, Route 9A, and a retention pond.  (Williamson Aff., Ex. 11, pp. 28 & 55).

> -there are significant safety concerns associated with constructing a tower in an area so close to a highway where cars regularly merge. (Williamson Aff., Ex. 11, pp. 28 & 55).

Mr. and Mrs. Shrewsbury, who reside at 5358 Losco Road in the immediate vicinity of the Proposed Site, presented a petition signed by twenty-six area homeowners who opposed the cell tower. (Williamson Aff., Ex. 11, pp. 42-49). In addition to presenting the petition, Mr. Shrewsbury offered fact-based testimony concerning the status of the tree coverage surrounding the Proposed Site. He testified that the trees, which T-Mobile claimed might assist in screening the proposed cell tower, were being cleared. This clearing would result in adjacent residents being subjected to increased exposure to the visual impact of the tower. (Amended Compl., Ex. E at p. 42). Mr. Shrewsbury also expressed concern about potential future growth in the area of the proposed tower. The public hearing concluded with the Commission voting to deny the Second Application. A written order followed that mirrored the Commission's order denying the First Application. (Williamson Aff., Ex. 18).

### B.      The "In Writing" Requirement

Under the Act, the City's decisions to deny T-Mobile's applications must be "in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). The Act does not define precisely what is meant by a "writing." Different Circuit Courts have assigned different levels of stringency to the writing requirement. See Verizon Wireless Personal Communications, LP v. Board of County Commissioners of Sarasota County, 2007 WL 2702331 (M.D. Fla. September 14, 2007) (discussing different courts' treatment of the "in writing" requirement and listing cases). After conducting a thorough review of various courts' treatment of the Act's "in writing" requirement, the Sixth Circuit in New Par v. City of Saginaw, 301 F.3d 390 (6th Cir. 2002), determined that in order for a decision by a State, local government or instrumentality thereof to be "in writing" for purposes of the Act it must: (1) be separate from the

11

written record; (2) describe the reasons for the denial; and (3) contain a sufficient explanation of the reasons for the denial to allow a reviewing court to evaluate the evidence in the record that supports those reasons." New Par, 301 F.3d at pp. 395-396.

While the Eleventh Circuit has declined to address directly the Act's "in writing" requirement, other decisions from the Middle District of Florida have adopted the sensible position outlined by the New Par court. See Verizon Wireless Personal Communications, LP, 2007 WL 2702331 at *1.

It is clear from the record that the Commission's denials were made on the record and re-iterated in separate written orders. Using the New Par standard, the Court finds that the Commission's denials of both the First and Second Applications satisfy the Act's written requirements. Under New Par a "sufficient explanation" allows a reviewing court to review the record for support, there is no separate requirement that a denial decision specifically identify the portions of the record upon which the denial is based. The record contains the transcripts of the public hearings held on the First and Second Applications. Pinpoint citation to the transcripts would have been helpful; however, the Act does not require such precision.

T-Mobile also claims that the Commission failed to comply with the Act by referencing the "Planning Department's recommendations." (Dkt. 27 at p. 16). Without a direct citation to the Act or any of its legislative support materials, T-Mobile claims that the Commission's written denial must "contain the basis of the Commission's decision, as opposed to the decision of another body." (Dkt. 27, pp. 16-17). It is clear from review of the transcripts of the public hearings that the Commission used both the evidence presented during the public hearings and the Planning Department's recommendations when reaching its decision to deny the First and Second

12

Applications. T-Mobile's "in writing" arguments are unpersuasive. T-Mobile argues as part of its "in writing" arguments that the Commission's proffered reasons for denial are perfunctory and lack any factual support. This argument is better addressed under the substantial evidence section of this Order. Thus, summary judgment will be **GRANTED** for the City and will be **DENIED** for T-Mobile on this point.

### C. Application of the Substantial Evidence Standard to the City's Denials

A local zoning authority decision to deny a request to place, construct or modify personal wireless services facilities must be supported by substantial evidence contained in a written record. 47 U.S.C. § 332(c)(7)(b)(iii). Substantial evidence is less than a preponderance but more than a scintilla. Metro PCS Inc. V. City of San Francisco, 400 F.3d 715, 725 (9th Cir. 2005).

The Act's substantial evidence requirement is a "procedural safeguard[,] which is centrally directed at whether the local zoning authority's decision is consistent with the applicable local zoning requirements." Town of Lincoln, 107 F.Supp.2d at 115 (internal citations omitted). The test is highly deferential to the local authority, giving it "'benefit of the doubt, since it requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree that *could* satisfy a reasonable fact finder.'" Penobscot Air. Servs. v. FAA, 164 F.3d 713, 718 (1st Cir. 1999) (quoting Allentown Mack Sales & Serv. V. NLRB, 522 U.S. 359, 366-67 (1998)). It is a court's job to determine whether the local authority's decision is based on "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. Substantial evidence is not "a large or considerable amount of evidence," and the fact two different conclusions could have been reached does not mean there is not substantial evidence. See Pierce v. Underwood, 487 U.S. 552, 565 (1998) (internal citations omitted). Review under this standard is essentially

deferential, such that courts may neither engage in their own fact-finding nor supplant a local zoning entity's reasonable determinations. Cellular Telephone Co. v. Town of Oyster Bay, 166 F.3d 490, 494 (2d Cir. 1999).

In evaluating the Commission's denials under this standard, the Court is required to consider all the evidence contained in the record - favorable and unfavorable. Id. The Court will uphold the City's decisions to deny the First and Second Applications as long as they are reasonably based upon evidence presented and not merely upon unsubstantiated conclusions. Town of Lincoln, 107 F.Supp.2d at 115. The Court may not uphold the City's decision on grounds that were not presented in written decisions.

### 1.    Generalized Aesthetic Concerns

T-Mobile complains that the city's denials were predicated on impermissible generalized aesthetic concerns, which were not supported by required substantial evidence. The City responds that its denials were supported by substantial evidence. The Commission's order denying the First Application reads in part:

> The proposed tower does not comply with the tower siting and design standards and performance standards of part 15, subpart A, Ordinance Code.
>
> The proposed tower design is not compatible with the existing contiguous uses or zoning and is not compatible with the general character and aesthetics of the surrounding neighborhood or area.

(Williamson Aff., Ex. 7).

As noted above, the Commission's written order denying the Second Application is virtually identical. (Williamson Aff. Ex. 18).

T-Mobile makes much of the Planning Department's alleged "strikingly different" treatment of the First and Second Applications. (Dkt. 27 at p. 8). Thus, the Court addresses T-Mobile's

14

concern as a threshold matter.  T-Mobile takes umbrage that the Planning Department found that the First Application complied with the tower siting and design standards and performance  standards of the Tower Ordinance but found that the Second Application for a shorter tower failed to comply with those same standards because the 130-foot tower would not be architecturally compatible with the surrounding community. This "different" treatment is of little consequence because as the City notes, the Planning Department's reports were consistent in that for both the First and Second Application, the Planning Department recommended denial..

T-Mobile's basic premise is that the City's evidence, to the extent that it exists, is so generalized as to lack any probative value.  It is clear that multiple cases have found that general, unsubstantiated aesthetic concerns have marginal evidentiary value.  See, e.g., PrimeCo Personal Communications, LP v. City of Mequon, 352 F.3d 1147, 1150-51 (7th Cir. 2003).  However, under the Act the Commission is entitled to make an "aesthetic judgment as long as the judgment is 'grounded in the specifics of the case,' and does not evince merely an aesthetic opposition to cell-phone towers in general.  Voice Stream PCS I, LLC, d/b/a T-Mobile v. City of Hillsboro, 301 F.Supp.2d 1251, 1258 (D. Oregon 2004) (internal citations omitted); see also Petersburg Cellular P'ship v. Bd. of Supervisors of Nottoway County (4th Cir. 2000) ("[If a zoning board] denies a permit based on the *reasonably-founded* concerns of the community then there is 'substantial evidence'" (emphasis in original)).  "Accordingly, when the evidence specifically focuses on the adverse visual impact of the tower at the particular location at issue more than a mere scintilla of evidence will probably exist." Voice Stream, 301 F.Supp at 1258 (emphasis in original).

Review of the record reveals that the City based its denials on more than a "scintilla of evidence 'grounded in the specifics of the case.'" Id. (citing to Todd, 244 F.3d at p. 61).

The City informs the Court that recommending denial of the First Application it relied upon a report issued by the Planning Department (after visiting the Proposed Site and considering the uses of the adjacent properties) and testimony and exhibits provided by T-Mobile, including contextual photographs/photographic simulations of the Proposed Site.   When considering the Second Application, the City again relied upon a report from the Planning Department and testimony and exhibits provided by T-Mobile.   In addition, the Commission considered the testimony of two witnesses who spoke in opposition to the use of the Proposed Site to house a cell tower.

The Planning Department's reports recommended denial of both the First and Second Applications.  These multi-paged reports contain pertinent language from the Tower Ordinance and provide written and pictorial overview of the Proposed Site.   The reports also contain written commentary from the Planning Department Staff supporting their recommendation.

The reports make clear that when making a recommendation as to compatibility of a cell tower existing with contiguous uses and zoning the Planning Department considers - height, location, existing uses and topography.  (Dkt. 28 at p. 3).  For example, in both reports the Planning Department noted that the adjacent residential zoning district allowed development of structures only up to thirty-five feet in height.  The City contends that this information was included to "show that the development of adjacent structures would be legally capped at thirty-five feet" which would make the presence of a 130- or 150-foot cell tower "that much more obvious and incompatible." (Dkt. 28 at p. 4).

In its review of the Second Application, the Planning Department reiterated many of the concerns it had with First Application. The Planning Department also noted that the surrounding properties lacked either tall structures or trees and vegetation that would help reduce the impact of

16

the proposed tower on adjacent landowners. During the public hearings on the First and Second Applications, Planning Department staff again addressed the incompatibility of the cell tower with the surrounding area.

Review of the above cited materials, including the voluminous submissions from T-Mobile, makes clear that the Commission's decision was not based only on 'generalized concerns about aesthetics" but rather was supported by both oral and documentary evidence submitted by the parties and oral evidence from pertinent witnesses. The Act does not require a court to evaluate each piece of evidence submitted for consideration, instead it can only determine whether substantial evidence exists to support a zoning board's decision. Here, the Court finds that the Commission had before it, and relied upon, sufficient and substantial evidence to support its decision to deny the First and Second Applications.

The witness testimony presented during the public hearing on the Second Application provides an example of the substantial evidence used by the Commission to support its denial of the Second Application. During that public hearing,[5] Mr. William and Mrs. Reba Shrewsbury testified in opposition to use of the Proposed Site to host a cell tower. Mr. Shrewsbury testified that he received a packet of information from T-Mobile about the construction of a cell tower on the Proposed Site. The Shrewsburys live in front of the Proposed Site and testified that the tower will be virtually in their backyard. The Shrewsburys testified on behalf of themselves and twenty-four others. The Shrewsburys collected twenty-four signatures (in addition to their own) on a petition against the tower and presented it to the Commission. (Williamson Aff. Ex. 16). The petition was

---

[5] Mrs. Shrewsbury testified that she was aware of the public hearing on the First Application and that she and her fellow neighbors had contacted their councilman to express their opposition to the tower. (Williamson Aff. Ex. 11 at p. 46).

17

made a part of the record.  (Williamson Aff., Ex. 11 at p. 44). The collected signatures are from

some of the six houses currently located in the immediate vicinity of the Proposed Site, as well as

from the majority of those living in a cul-de-sac neighborhood near the Proposed Site on Landing

Estates Drive containing approximately thirty houses.  According to the Shrewsburys, the houses

in the Landing Estates neighborhood "will have a clear view of where the tower is going to be"

(Williamson Aff., Ex. 7 at p. 45) and everyone in the neighborhood was opposed to it.

Mr. Shrewsbury provided uncontroverted testimony that a new subdivision was being built

and as a result, the trees that T-Mobile claimed would provide a buffer, were in fact, now being torn

down.  The Shrewsburys further testified that three new residential housing developments were

being completed in the immediate vicinity of the Proposed Site and that "these people aren't going

to have a voice at all if this goes through and is built before they get in." (Williamson Aff., Ex. 11,

p. 43).  Mrs. Shrewsbury specifically noted that "if [the Second Application] were coming before

the board in -- two years from now, when these three developments are completed and houses are

there, I don't think they'd have a chance of getting the tower there." (Williamson Aff., Ex. 11, p.

47).  Mrs. Shrewsbury suggested that the tower might be better located in a more industrialized area.

Mrs. Shrewsbury closed her remarks to the Commission by stating:

> So I, in closing, would -- and my husband and all the people
> represented on the petition would like to say that we object to the tower going
> in this particular location based on the fact that we don't want a cell tower in
> our backyards.

> And I will also say that, you know, the DOT obviously doesn't even
> want it there.  So based on, you know, what was said, it is one of the highest
> growth areas in the community, and I do believe that the 26 people --my
> husband and I included in that --feel very strongly that we don't want a tower
> in that location.

(Williamson Aff., Ex. 11 at p. 47).

18

The Shrewsbury testimony is particularized as to the Proposed Site and expresses the opposition of over twenty-six people to it. The Shrewsburys' testimony makes clear that a significant number of people in the immediate vicinity of the Proposed Site are opposed to its being used to house a cell tower. The Shrewsburys' testimony also contradicts T-Mobile's claim several of the adjacent property owners did not object to the construction of the proposed tower. (Williamson Aff., Ex. 11, pp. 12-13 & 53). Full review of the Shrewsburys' testimony makes clear that the Shrewsburys do not simply express a "NIMBY" (Not in My Backyard) perspective, as T-Mobile characterized their testimony in its summary judgment motion. (Dkt. 27 at p. 10). Instead the Shrewsburys testified about legitimate concerns they and their neighbors had regarding construction of a cell tower on the Proposed Site. These concerns were based on aesthetics, in that the trees that T-Mobile claimed would serve as a buffer were no longer there and incompatibility, because the area in which the Proposed Site is located is experiencing significant residential growth[6].

T-Mobile claims that "the speculative possibility of future residential growth in the area does not amount to substantial evidence that a tower permit application does not otherwise meet applicable standards." (Dkt. 29 at p. 12, citing to Sprint Spectrum, L.P. v. County of St. Charles, 2005 WL 1661496 at *7 (E.D. Mo. July 6, 2005). Uncontroverted evidence that three new residential housing units were in the process of being approved or built is not speculative. This evidence of growth specifically negates T-Mobile's contention that the Proposed Site is appropriate for a cell tower because the tower would "be surrounded by 33 acres of property zoned Rural Residential containing only six single family homes." (Dkt. 27 at p. 17). In addition, the growth

---

[6] The Commission Chairman also stated on the record during the public hearing on the Second Application that the Proposed Site was currently zoned RR, but that "this is also one of the largest growth areas in this part of the county." (Williamson Aff., Ex. 11 at p. 9).

in the area of the Proposed Site means that T-Mobile's reliance on the Proposed Site's alleged similarity to sites where the Commission had previously approved construction of similar towers may be unfounded.

Finally, the Shrewsburys' testimony did not express any generalized hostility to cell towers. Rather, the Shrewsburys testified that a parcel of land in an industrialized area might be a better host for the proposed tower (and made some specific suggestions as to where the tower could be sited). Particularized public opposition such as the testimony offered by the Shrewsburys, may be considered by a zoning authority when making its decision. The Shrewsburys' testimony is substantial evidence upon which the Commission was entitled to rely.  See Sprint Spectrum L.P. v. County of Palette Missouri, 2007 WL 2994362 *4 (W.D. Mo. Oct. 11, 2007) (internal citations omitted).

T-Mobile seems to believe that it provided the Commission with overwhelming and substantial evidence that required the Commission to grant the First and Second Applications.  As demonstrated above, some of the evidence T-Mobil relied upon was not necessarily that reliable or was simply wrong.  In addition, the Act does not  allow the Court to displace the Commission's "fair estimate of conflicting evidence"  (Dkt. 28 at p. 18), rather it requires the Court to make a determination that the evidence relied upon was substantial.

### 2.        Feasibility of Alternative Sites

Based on the Court's finding that the Commission's denials were based  on substantial evidence, it is not necessary to address the Commission's supposed "unlawful" reliance on the feasibility of alternative sites as a basis for its denials.  The Court notes however, that T-Mobile has been on notice since it filed the First Application that the Planning Department and the Commission

both believed that the DOT right-of-way may offer a better site for the proposed tower. T-Mobile considered the site itself and maintains that the DOT site could be used as a "last resort."(Williamson Aff., Ex. 11 at p. 28). As is readily evident from the pictures produced by T-Mobile as part of its applications, the Proposed Site is adjacent to the DOT site. This proximity is the reason why the Planning Department and Commission focused on the DOT site. T-Mobil did provide some evidence to the Commission that the DOT site was not a feasible alternative. However, much of the evidence provided was based on T-Mobile's own conjecture. This is because T-Mobile informed the Commission that it was unable to reach DOT directly to discuss the possibility of using the DOT site for the tower.

T-Mobile objects to the Commission's discussion of the DOT site as a feasible alternative because it claims that the Commission provided no evidence that the DOT site would have satisfied its site review criteria. T-Mobile had the ability, time and means to thoroughly convince the Commission of the notion that the DOT site was a feasible alternative. T-Mobile's failure to provide the Commission with detailed information about the DOT site will not be used by the Court to the City's detriment. If the Court did allow this, it would mean that a telecommunications company could use its own failure as a weapon in federal court, which is patently unacceptable.

### IV.    Conclusion

For the reasons cited above, the City's Motion for Summary Judgment on Consolidated Count I (Dkt. 28) is **GRANTED** and T-Mobile's Motion for Summary Judgment on Consolidated Count I (Dkt. 27) is **DENIED**. Counts III and IV remain pending before the Court. As determined by earlier Order of this Court (Dkt 23), the parties may file cross-motions for summary judgment on Counts III and IV within twenty (20) days from the date of this Order, if they choose, with

responses in opposition following ten (10) days later.  However, as T-Mobile itself noted, the Commission has approved at least six cell towers in the City recently.  Thus, T-Mobile is forewarned that the Commission's approval history does not necessarily indicate a general hostility to *any* tower in the area.  <u>See</u> <u>AT&T v. Virginia Beach</u>, 979 F.Supp. 416 (D.Va. 1997).  Although the Court finds that the Commission has substantial evidence before it, it is certainly not so substantial as to amount to a preponderance of the evidence.

 **DONE** and **ORDERED** from Chambers in Jacksonville, Florida on this 3rd day of June, 2008.

JOHN H. MOORE II
United States District Judge

Copies to: Counsel of Record